LYONS, Justice.
DBI, Inc., f/k/a Duck Boo International Co., Ltd. (“DBI”), a defendant in an action pending in the Mobile Circuit Court, petitioned in a prior proceeding for a writ of mandamus asking this Court to direct the trial court to dismiss the claims against it on the basis that the trial court lacks personal jurisdiction over DBI. We concluded that we could not satisfactorily address the issue presented at that time without the completion of the further discovery that was outstanding in the trial court and as to which a motion to compel had been granted. Therefore, we denied the petition as premature. See Ex parte Duck Boo Int’l Co., 985 So.2d 900 (Ala.2007). Now that the discovery has been completed and the trial court has again denied DBI’s renewed motion to dismiss, DBI has filed a second petition for a writ of mandamus. We deny the petition.
I. Factual Background and Procedural History
The underlying action was brought by Tonya Leann Leytham, in her capacity as administratrix and personal representative of Tiffany Stabler’s estate and as Stabler’s mother and next friend. Leytham sued DBI, a manufacturer of seat belts for motor vehicles; Kia Motors America, Inc., and Kia Motors Corporation (collectively referred to as “Kia Motors”); and several other defendants following an automobile accident on July 4, 2004, as a result of which Stabler died. Stabler was driving a 1999 Kia Sephia automobile, a vehicle manufactured by Kia Motors, that was equipped with a seat belt manufactured by DBI. Leytham alleges that Stabler was wearing her seat belt at the time of the accident but that the seat belt malfunctioned, allowing Stabler to be ejected from her vehicle and to suffer fatal injuries.
DBI is located in the Republic of Korea (“South Korea”) and contends that it does no direct business with, or in, the United States. After Leytham filed her complaint, DBI filed a motion to dismiss the claims against it, alleging that the trial court lacked personal jurisdiction over it. DBI supported its motion with the affidavit of Jung-Ho Choi, the director in charge of the technical department at DBI. Ley-tham thereafter served interrogatories and requests for production on DBI. Reasserting the jurisdictional arguments contained in its motion to dismiss and also arguing that Leytham had not alleged a colorable claim of jurisdiction, DBI asserted that a response to the discovery was not required. Leytham filed a motion to compel, contending that because DBI placed the seat belts into the stream of commerce in the United States without any limitations, DBI should reasonably expect to be haled into court in one of the states in which the product is used. For that reason, she argued, DBI was required to respond to discovery directed to the issue of personal jurisdiction.
Leytham amended her complaint to add additional jurisdictional allegations. The trial court thereafter granted the motion to compel before DBI had filed a response. DBI moved for reconsideration, contending that simply allowing a product to be placed into the stream of commerce was insufficient to subject an entity to jurisdiction in Alabama, and that evidence was required indicating that it had purposefully availed itself of the privilege of doing busi *638 ness in Alabama and that it had purposefully directed activities toward Alabama. The trial court denied the motion to reconsider. Leytham then filed a second amended complaint; DBI filed a motion to dismiss it, adopting and incorporating its previously filed motion to dismiss.
After this Court denied DBI’s petition for a writ of mandamus in Ex parte Duck Boo, the parties engaged in the further discovery ordered by the trial court. DBI states that, based on its understanding of this Court’s opinion in Ex parte Duck Boo, it initially limited its discovery responses to requests related to the volume, the value, and the alleged hazardous character of the product,[1] and also limited its responses to Alabama and the model of seat belt used in the vehicle Stabler was driving, the SG-284 model, because, DBI argued, the relevant inquiry for jurisdictional purposes turns on DBI’s contact with Alabama. Leytham filed another motion to compel, arguing that DBI should be required to respond to discovery requests that went beyond the volume, the value, and the allegedly hazardous nature of DBI’s products and that DBI had improperly limited its responses to Alabama and the SG-284 model seat belt at issue. Instead, Ley-tham argued, DBI should be required to provide responses for all model seat belts and for the United States as a whole. The trial court granted Leytham’s motion to compel. DBI supplemented its discovery responses to include information concerning its contacts with the United States and information regarding all seat-belt models provided to Kia Motors for use in automobiles sold in the United States but stated that it lacked the ability to break down its responses by state. The trial court denied DBI’s motion to dismiss Leytham’s second amended complaint. DBI then filed this petition for a writ of mandamus.
II. Factual Matters Pertaining to Minimum Contacts
Leytham’s complaint alleges that the following establish that the trial court has personal jurisdiction over DBI:
• DBI “purchased and carries liability insurance that provides insurance coverage in every one of the United States, including Alabama.”
• DBI “has engaged in designing, manufacturing and marketing its seatbelts and other products to conform with United States governmental and industry wide safety and design standards and criteria, including safety standards by United States regulatory agencies and state common law court decisions, including the Courts of Alabama.”
• DBI “and/or its representatives have attended American automobile manufacturing trade shows and/or have participated in trade groups to ensure that [DBI’s] products comply with governmental and industry wide safety and design standards and criteria, including government standards imposed by legislative bodies, regulatory agencies and/or state common law court decisions, including the Courts of Alabama.”
• DBI “has advertised through the World Wide Web and print and other media with a goal towards expanding the markets for its seatbelts and other products to all of the United States, including Alabama.”
• DBI “has employed personnel and consultants ... to provide guidance and advice about how to successfully market its seatbelts and other products to auto *639 mobile and other manufacturers who, in turn, sell their products in all of the United States, including Alabama.”
• DBI “has retained American legal counsel ... to defend and protect [its] interests when foreseeable product liability suits would be filed against it in the United States, including Alabama.”
• DBI attached to the seat belt in the automobile driven by Stabler “a label written in the English language and stating, among other things, that it was manufactured by [DBI] and that it complies with the United States Federal Motor Vehicle Safety Standards applicable to seatbelts.”
• DBI “contracted with one or more companies in the United States to conduct seatbelt testing, it being the purpose of [DBI] to avail itself of markets throughout the United States, including Alabama.”
• DBI “has had many different models of its seatbelts shipped to the United States to be tested for compliance with the United States of American Federal Motor Vehicle Safety Standard 209 by a U.S. based company — i.e., SGS U.S. Testing Company, Inc.”
• DBI “attaches identification tags to the seatbelts that it manufactures, just like the seatbelt with the label in English referenced hereinabove.”
• DBI “previously included on its website a time line stating that in 1987 it began to export vehicle seatbelts to the United States.”
In support of her initial motion to compel discovery, Leytham submitted to the trial court pleadings in actions against DBI in other states, documents produced by Kia Motors reflecting testing of seat belts manufactured by DBI by SGS U.S. Testing Company, Inc., and an affidavit of one of Leytham’s attorneys attaching a photograph of the DBI seat belt on the vehicle involved in the accident made the basis of this claim, which reflects that DBI manufactured the seat belt in accordance with United States Federal Motor Vehicle Safety Standards (“FMVSS”).
DBI’s motion to dismiss relied upon the affidavit of Choi, who testified that the following list of items indicated that DBI did not have sufficient minimum contacts with Alabama to subject it to the jurisdiction of an Alabama court:
• DBI conducts business entirely within South Korea and maintains no agents, physical presence, or property within Alabama or the United States.
• DBI manufactures vehicle-restraint systems that it sells exclusively to South Korean final-stage motor-vehicle manufacturers, who are solely responsible for integrating DBI’s restraint systems into their final products.
• DBI has no control over where the final product is marketed, sold, or distributed, because the marketing, selling, and distributing is left to the final-stage manufacturer.
• DBI is not authorized, qualified, licensed, or registered to do business in Alabama.
• DBI does not sell any products in Alabama.
• DBI has never entered into any contract in Alabama; has never entered into a contract with an Alabama resident; and has never entered into a contract to be performed in Alabama.
• DBI has never transacted business in Alabama and is not currently doing business in Alabama.
• DBI has never provided any services in Alabama.
• DBI does not now pay, and has never paid, taxes in Alabama.
• DBI does not now own, rent, purchase, or lease, nor has it ever owned, rented, *640 purchased, or leased, any real or personal property in Alabama.
• DBI does not maintain any office or place of business in Alabama, does not have any assets in Alabama, and does not have any distributors in Alabama.
• DBI has never had an agent for service of process in Alabama and has never maintained a telephone, telex, or telefax number or address in Alabama.
• DBI does not have, and never has had, any employees (including salespersons, representatives, agents, or servants) who conducted business in Alabama or who were residents of Alabama.
• DBI does not advertise, and has never advertised, in Alabama.
• DBI does not solicit, and has not ever solicited, business directly or through agents in Alabama.
• DBI does not provide regular advice to customers in Alabama.
• DBI has never marketed any product in Alabama.
• DBI has no officers, employees, or directors living in Alabama.
• DBI has never applied for a loan or acted as a guarantor or cosigner on a bank loan in Alabama.
• DBI has never maintained any records, bank accounts, payroll records, books of account, and/or any other business record in Alabama.
• DBI has never initiated litigation in Alabama.
• DBI has never consented to personal jurisdiction of a court in Alabama.
• DBI never anticipated or intended that it would be subject to personal jurisdiction in Alabama.
• DBI does not derive any revenue from Alabama.
• All transactions relating to DBI’s sale of restraint systems to vehicle manufacturers (including Kia Motors) occur in South Korea.
• No aspect of the relationship between DBI and Kia Motors takes place in the United States.
• DBI did not install the restraint systems into the automobile Stabler was driving at the time of the accident.
• DBI did not manufacture, sell, or distribute the automobile Stabler was driving.
• DBI did not service, maintain, or repair the automobile Stabler was driving or any of its components.
• DBI had no knowledge of what happened to its vehicle-restraint systems after it sold them to Kia Motors Corporation (a South Korean corporation) in South Korea, beyond the general knowledge that its restraint systems would be installed in vehicles manufactured in South Korea.
• DBI was not involved in bringing the subject automobile, restraint systems, or any components of the vehicle into the United States or Alabama.
After this Court’s opinion in Ex parte Duck Boo, Leytham moved to compel DBI to provide fuller and more detailed interrogatory answers and to produce documents. Although the trial court granted her motion to compel, Leytham says that DBI limited its responses to only the SG-284 model seat belt, revealing the numbers of those seat belts that incorporated an English-language label stating compliance with the FMVSS during the years 1997 through 2000 as follows:
1997 16,156
1998 108,383
1999 84,240
2000 33,869
As to Leytham’s other interrogatories, she contends that DBI was evasive. When asked for the total number of labels written in English purchased by DBI each year from 1999 to the present that stated *641 that DBI was in compliance with the FMVSS, DBI gave only the number of labels for FMVSS-labeled SG-284 seat belts: 84,240 in 1999 and 38,869 in 2000. Further, DBI identified Kia Motors, Dae-woo Motors Corp., and GM Daewoo Auto & Technology as purchasers from it of seat belts with FMVSS-compliant labels. When asked to state, for the years 1997 to present, the amount of money, with the type of currency identified, that DBI charged for the seat belts DBI sold each year with FMVSS labels attached, DBI answered: “DBI invoiced Kia Motors Corp. in Korean won.” DBI supplemented this response by stating: “In 1999, the price that Kia Motors Corp. paid DBI for each seat belt assembly was 11,072 Korean won.” Leytham then filed another motion to compel, which the trial court granted.
In supplemental interrogatory answers, DBI provided the following information:
• DBI identified 12 civil actions against it alleging injury, damage, or death due to defective conditions regarding passenger-restraint systems, the component parts of such systems, or similar products. Leytham states she has found four additional such actions not identified by DBI.
• DBI stated that it “does not issue any warranties to end users but has entered into a Claim Indemnification with Kia Motors Corp.”
• The annual sales for years 1997 through 2000 of Kia vehicles in the United States compares with DBI’s sales of FMVSS-labeled SG-284 seat belts to Kia Motors as follows:
Kia U.S. Year Sales
1997 55,325
1998 82,893
1999 134,594
2000 160,606
DBI FMVSS SG-284
seat belts 16,156 108,383 84,240 33,869
• When asked to state the number of seat belts or seat-belt buckles it manufactured to which it attached a label written in English stating that the seat belt or buckle complied with applicable United States safety standards for the years 1997 through 2007, DBI stated: “DBI is no longer in possession of information responsive to this interrogatory for the years 1997 to 2002.” DBI then provided answers for the years 2003 through 2007:
2003 311,039
2004 550,604
2005 434,106
2006 507,327
2007 887,959
• DBI stated that it sold 2,691,035 FMVSS-labeled seat belts from 2003 through 2007.
• The annual sales for years 2003 through 2007 of Kia vehicles in the United States compares with DBI’s sales of all FMVSS-labeled seat belts to Elia Motors as follows:
Kia U.S. DBI FMVSS
Year Sales seat belts
2003 237,471 311,039
2004 270,055 550,604
2005 275,851 434,106
2006 294,290 507,327
2007 305,473 887,959
Leytham states she requested information on the sale price of DBI’s seat belts to show DBI’s profits from sales of Kia vehicles in Alabama. DBI identified the value of only its 1999 sales: 11,072 won per unit. Using historical exchange rates to calculate approximate value in dollars of the sales of FMVSS-labeled SG-284 units from 1997 through 2000, Leytham calculated the total value to DBI to be $2,161,154.23.
DBI sold 2,691,035 FMVSS-labeled seat belts from 2003 through 2007.[2] Using the *642 1999 figure of 11,072 won per unit and the 1999 exchange rate of 1189.84 won per dollar, Leytham calculates the value of DBI’s sales of those seat belts for the years 2003 through 2007 to be $25,026,625. Adding the estimated value of SG-284 FMVSS-labeled units from 1997-2000, Leytham calculates approximately $27,000,000 in total revenue on the disclosed sales. She states this figure is un-derinclusive because of DBI’s incomplete disclosures as to seat belts and because DBI manufactures items other than seat belts, such as crash pads and damping sheets, for incorporation into vehicles that are sold in the United States.
Leytham notes that a major purchaser of DBI’s seat belts is the South Korean automobile manufacturer Kia Motors. In her opposition to DBI’s motion to dismiss, Leytham provided the following information obtained from Kia Motors’ official Web site on the Internet: Kia Motors entered the United States market in 1994, sold its 300,000th vehicle in the United States in 1999, and had sold over 1,270,000 vehicles in the United States by 2004. There are nine Kia Motors dealerships in Alabama, including the dealership that is one of the defendants in this case. In its petition before this Court, DBI acknowledges that Kia Motors has nine dealerships in Alabama but states that the percentage of dealerships in Alabama is small compared to the number of Kia Motors dealerships throughout the United States.
III. Standard of Review
As we stated in Ex parte Duck Boo, this Court recently addressed the standard of review in a proceeding challenging the trial court’s ruling on a motion to dismiss for lack of personal jurisdiction:
“ ‘ “The writ of mandamus is a drastic and extraordinary writ, to be ‘issued only when there is: 1) a clear legal right in the petitioner to the order sought; 2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; 3) the lack of another adequate remedy; and 4) properly invoked jurisdiction of the court.’ Ex parte United Serv. Stations, Inc., 628 So.2d 501, 503 (Ala.1993); see also Ex parte Ziglar, 669 So.2d 133, 134 (Ala.1995).” Ex parte Carter, [807 So.2d 534,] 536 [(Ala.2001) ].’
“Ex parte McWilliams, 812 So.2d 318, 321 (Ala.2001). ‘An appellate court considers de novo a trial court’s judgment on a party’s motion to dismiss for lack of personal jurisdiction.’ Elliott v. Van Kleef, 830 So.2d 726, 729 (Ala.2002).
“ ‘ “ ‘In considering a Rule 12(b)(2), Ala. R. Civ. P., motion to dismiss for want of personal jurisdiction, a court must consider as true the allegations of the plaintiffs complaint not controverted by the defendant’s affidavits, Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253 (11th Cir.1996), and Cable/Home Communication Corp. v. Network Productions, Inc., 902 F.2d 829 (11th Cir.1990), and “where the plaintiffs complaint and the defendant’s affidavits conflict, the ... court must construe all reasonable inferences in favor of the plaintiff.” Robinson, 74 F.3d at 255 (quoting Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir.1990)).’ ”
“ ‘Wenger Tree Serv. v. Royal Truck & Equip., Inc., 853 So.2d 888, 894 (Ala.2002) (quoting Ex parte Mclnnis, 820 So.2d 795, 798 (Ala.2001)). However, if the defendant makes a prima facie evidentiary showing that the Court has no personal jurisdiction, “the plaintiff is then required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and he may not *643 merely reiterate the factual allegations in the complaint.” Mercantile Capital, LP v. Federal Transtel, Inc., 193 F.Supp.2d 1243, 1247 (N.D.Ala.2002) (citing Future Tech. Today, Inc. v. OSF Healthcare Sys., 218 F.3d 1247, 1249 (11th Cir.2000)). See also Hansen v. Neumueller GmbH, 163 F.R.D. 471, 474-75 (D.Del.1995) (“When a defendant files a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2), and supports that motion with affidavits, plaintiff is required to controvert those affidavits with his own affidavits or other competent evidence in order to survive the motion.”) (citing Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 63 (3d Cir.1984)).’
“Ex parte Covington Pike Dodge, Inc., 904 So.2d 226, 229-30 (Ala.2004).”
Ex parte Bufkin, 936 So.2d 1042, 1044-45 (Ala.2006).
IV. Analysis
A. Alabama’s “Long-Aim Rule”
The extent of an Alabama court’s personal jurisdiction over a person or corporation is governed by Rule 4.2, Ala. R. Civ. P., Alabama’s “long-arm rule,” bounded by the limits of due process under the federal and state constitutions. Sieber v. Campbell, 810 So.2d 641 (Ala.2001). Rule 4.2(b), as amended in 2004, states:
“(b) Basis for Out-of-State Service. An appropriate basis exists for service of process outside of this state upon a person or entity in any action in this state when the person or entity has such contacts with this state that the prosecution of the action against the person or entity in this state is not inconsistent with the constitution of this state or the Constitution of the United States .... ”
In accordance with the plain language of Rule 4.2, both before and after the 2004 amendment, Alabama’s long-arm rule consistently has been interpreted by this Court to extend the jurisdiction of Alabama courts to the permissible limits of due process. Duke v. Young, 496 So.2d 37 (Ala.1986); DeSotacho, Inc. v. Valnit Indus., Inc., 350 So.2d 447 (Ala.1977). As this Court reiterated in Ex parte McInnis, 820 So.2d 795, 802 (Ala.2001) (quoting Sudduth v. Howard, 646 So.2d 664, 667 (Ala. 1994)), and even more recently in Hiller Investments Inc. v. Insultech Group, Inc., 957 So.2d 1111, 1115 (Ala.2006): “Rule 4.2, Ala. R. Civ. P., extends the personal jurisdiction of the Alabama courts to the limit of due process under the federal and state constitutions.” (Emphasis added.)
This Court discussed the extent of the personal jurisdiction of Alabama courts in Elliott v. Van Kleef 830 So.2d 726, 730 (Ala.2002):
“This Court has interpreted the due process guaranteed under the Alabama Constitution to be coextensive with the due process guaranteed under the United States Constitution. See Alabama Waterproofing Co. v. Hanby, 431 So.2d 141, 145 (Ala.1983), and DeSotacho, Inc. v. Valnit Indus., Inc., 350 So.2d 447, 449 (Ala.1977). See also Rule 4.2, Ala. R. Civ. P., Committee Comments on 1977 Complete Revision following Rule 4.4, under the heading ‘ARCP 4.2.’ (‘Subpar-agraph (I)[3] was included by the Committee to insure that a basis of jurisdiction was included in Alabama procedure that was coextensive with the scope of the federal due process clause....’).
*644 “The Due Process Clause of the Fourteenth Amendment permits a forum state to subject a nonresident defendant to its courts only when that defendant has sufficient ‘minimum contacts’ with the forum state. International Shoe Co. v. Washington, 826 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The critical question with regard to the nonresident defendant’s contacts is whether the contacts are such that the nonresident defendant ‘ “should reasonably anticipate being haled into court” ’ in the forum state. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), quoting WorldWide Volkswagen Corp. v. Woodson, 444 U.S. 286, 295, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).”
B. The Muddled Status of United States Supreme Court Precedent
In 1980 and 1985, the United States Supreme Court decided two pivotal cases concerning the concept of personal jurisdiction. The first was World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); the second was Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Two years after deciding Burger King, in Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), the Court returned to the subject of the minimum contacts necessary to establish personal jurisdiction. In Ex parte Duck Boo, we discussed the sharply divided Supreme Court’s plurality opinions in Asahi.
“In [Asahi ], the Court considered whether the defendant’s act of placing the product into the stream of commerce subjected it to jurisdiction in a forum that the product foreseeably reached. The Court split three ways, with four Justices in one camp, four in another, and Justice Stevens in the middle. Four Justices emphasized that the defendant must insert the product into the stream of interstate commerce with a reasonably specific ‘intent or purpose to serve the market in the forum State,’ 480 U.S. at 112, 107 S.Ct. 1026 (plurality opinion of O’Connor, J.), while four dissenting Justices emphasized that placement into the stream of commerce with reasonable foreseeability of the arrival of the product into the forum state was sufficient. 480 U.S. at 117, 107 S.Ct. 1026 (Brennan, J., concurring in part and concurring in the judgment). Justice Stevens provided the fifth vote to hold that a finding of personal jurisdiction in that case did not comport with due process. In his special -writing, after concluding that the fundamental unfairness was sufficiently clear as to obviate the necessity for articulation of a standard, Justice Stevens stated:
“ ‘Second, even assuming that the test ought to be formulated here, Part II-A misapplies it to the facts of this case. The plurality seems to assume that an unwavering line can be drawn between “mere awareness" that a component will find its way into the forum State and “purposeful availment” of the forum’s market. [480 U.S. at 110-13.] Over the course of its dealings with Cheng Shin, Asahi has arguably engaged in a higher quantum of conduct than “[t]he placement of a product into the stream of commerce, without more .... ” Ibid. [480 U.S. at 112.] Whether or not this conduct rises to the level of purposeful availment requires a constitutional determination that is affected by the volume, the value, and the hazardous character of the components. In most circumstances I would be inclined to conclude that a regular course of dealing that results in deliveries of over *645 100,000 units annually over a period of several years would constitute “purposeful availment” even though the item delivered to the forum State was a standard product marketed throughout the world.’
“480 U.S. at 122, 107 S.Ct. 1026 (Stevens, J., concurring in part and concurring in the judgment) (emphasis added).”
985 So.2d at 909-10. The test articulated by Justice O’Connor, often referred to as the “stream-of-commeree-plus” test, garnered only four votes; the test articulated by Justice Brennan, often referred to as the “stream-of-commerce” test, also garnered only four votes. Justice Stevens embraced neither rationale, but agreed with the other eight Justices that there was no personal jurisdiction in the case under consideration. In the years following the Asahi decision, federal and state courts have split over the question whether to adopt the stream-of-commerce-plus test or the stream-of-commerce test or to decline to adopt either test, relying instead on the clearly established principles of World-Wide Volkswagen and Burger King or holding that the jurisdiction question of a particular case could be decided under any of the Asahi tests.[4]
C. Recent Alabama Cases Applying United States Supreme Court Precedent
This Court adopted the stream-of-commerce-plus test in Ex parte Alloy Wheels International, Ltd., 882 So.2d 819, 827 (Ala.2003). We stated:
“The plaintiff now before us argues that the evidence establishes an intent or purpose in Alloy Wheels to serve, in the words of its brief, ‘the American market.’ Evidence of an intent or purpose to serve ‘the American market,’ however, absent evidence of ‘an intent or purpose to serve the market in the forum State,’ does not establish the ‘action of the defendant purposefully directed toward the forum State’ that would constitute contact sufficient to warrant the exercise of personal jurisdiction over the defendant by the forum state. [Ex parte] McInnis, [820 So.2d 795,] 804 [ (Ala.2001) ] (quoting Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)). On the contrary, the plaintiff now before us has not submitted substantial evidence that Alloy Wheels ‘purposefully directed’ any action ‘at the forum State [other] than the mere act of placing a product in the stream of commerce.’ World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), Asahi, and Mcln-nis, supra. No evidence establishes sufficient minimum contacts between Alloy Wheels and the State of Alabama.”
Since our decision in Alloy Wheels, we have been requested in previous cases to revisit that opinion and to overrule it, requests that we declined. See Brown v. ABUS Kransysteme GmbH, 11 So.3d 788 (Ala.2008); Ex parte Duck Boo. However, we indicated that we would consider revisiting Alloy Wheels when the proper case was presented to us. Id. This is such a case, and Leytham has specifically requested that we overrule Alloy Wheels. Leytham argues that we should adopt either the stream-of-commerce test or the test articulated by Justice Stevens in As-ahi. DBI argues that overruling Alloy *646 Wheels is unwarranted and that we should retain the stream-of-commerce-plus test.
In Brown, Justice Woodall, writing for the Court, pointed out that the portion of World-Wide Volkswagen that gave rise to the tests in both plurality opinions in As-ahi was dictum.
“The source of both versions of the stream-of-commerce doctrine, which divided the Asahi Court, is dictum in World-Wide Volkswagen Corp. v. Woodson. In Woodson, New York residents Harry Robinson and Kay Robinson purchased a new Audi automobile from Seaway Volkswagen, Inc. (‘Seaway’), a retail dealer in Massena, N.Y. 444 U.S. at 288. The regional distributor for Audi automobiles — which served the states of New York, New Jersey, and Connecticut — was World-Wide Volkswagen Corporation (‘World-Wide’). Id. at 288-89. The automobile was manufactured by Audi NSU Auto Union Aktiengesells-chaft (‘Audi’) and was imported by Volkswagen of America, Inc. (‘Volkswagen’). 444 U.S. at 288.
“The following year, the Robinsons were driving through Oklahoma when their automobile collided with another vehicle. The impact created a fire, and Kay Robinson and the Robinsons’ two children were injured. ‘The Robinsons subsequently brought a products-liability action in the District Court for Creek County, Okla., claiming that their injuries resulted from defective design and placement of the Audi’s gas tank and fuel system.’ 444 U.S. at 288. Defendants named in the suit were (1) Seaway, (2) World-Wide, (3) Audi, and (4) Volkswagen. Id.
“The New York defendants, Seaway and World-Wide, contested the exercise of personal jurisdiction over them in Oklahoma. Specifically, they sought a writ of prohibition restraining the trial judge ‘from exercising in personam jurisdiction.’ 444 U.S. at 289. From the denial of that relief in the Oklahoma Supreme Court, they sought certiorari review in the United States Supreme Court.
“The United States Supreme Court reversed the judgment of the Oklahoma Supreme Court, holding that the unilateral activity of the New York residents in driving a car they had purchased from a New York retailer to Oklahoma did not constitute contacts sufficient to subject the New York retailer and distributor to suit in Oklahoma. 444 U.S. at 299. In the course of its discussion, the Court stated:
“ ‘[I]f the sale of a product of a manufacturer or distributor ... is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State. Cf. Gray v. American Radiator & Standard Sanitary Corp., 22 I11.2d 432,176 N.E.2d 761 (1961).’
“444 U.S. at 297-98 (emphasis added).
“This language in Woodson has been correctly characterized as dicta, because there was in Woodson no such manufacturer or importer before the Court contesting jurisdiction. See Nelson v. Park Indus., Inc., 717 F.2d 1120, 1124-25 (7th Cir.1983); Spartan Motors, Inc. v. Lube *647 Power, Inc., 337 Ill.App.3d 556, 564, 786 N.E.2d 613, 620, 272 Ill.Dec. 74, 81 (2003); Ruckstuhl v. Owens Corning Fiberglas Corp., 731 So.2d 881, 887 (La. 1999); Juelich v. Yamazaki Mazak Optonics Corp., 682 N.W.2d 565, 571 n. 4 (Minn.2004); and Kawasaki Steel Corp. v. Middleton, 699 S.W.2d 199, 201 (Tex.1985).
“Nevertheless, the language served as the foundation for both plurality opinions in Asahi. The point of disagreement between the authors of those plurality opinions was whether jurisdiction may turn on the mere ‘foreseeability’ that the seller’s product would ‘enter the forum state.’ Asahi, 480 U.S. at 111-12 (due process requires ‘something more’ than mere foreseeability (per O’Connor, J.)); 480 U.S. at 117 (defendant need only be ‘aware that the final product is being marketed in the forum State’ (per Brennan, J.)).”
11 So.3d at 796-97.
Moreover, neither Alloy Wheels nor another opinion of this Court on which Alloy Wheels relied, Ex parte McInnis, 820 So.2d 795 (Ala.2001), pointed out that the stream-of-commerce-plus test was endorsed by only a plurality of the Supreme Court, not the majority that would have made it binding precedent. The Court stated in Alloy Wheels:
“In Ex parte McInnis, this Court explained the application of the stream of commerce doctrine to a products liability case:
“ ‘In World-Wide Volkswagen Corp. [v. Woodson], 444 U.S. [286] at 297-98, 100 S.Ct. 559 [(1980)], the Supreme Court stated that “[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.” In Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), the Supreme Court clarified the “stream of commerce” doctrine of personal jurisdiction:
“‘“Since World-Wide Volkswagen, lower courts have been confronted with cases in which the defendant acted by placing a product in the stream of commerce, and the stream of commerce eventually swept defendant’s product into the forum State, but the defendant did nothing else to purposefully avail itself of the market in the forum State. Some Courts have understood the Due Process Clause, as interpreted in World-Wide Volkswagen, to allow an exercise of personal jurisdiction to be based on no more than the defendant’s act of placing the product in the stream of commerce. Other courts have understood the Due Process Clause and the above-quoted language in World-Wide Volkswagen to require the action of the defendant to be more purposefully directed at the forum State than the mere act of placing a product in the stream of commerce.
“ ‘ “We now find this latter position to be consonant with the requirements of due process. The ‘substantial connection,’ [Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); McGee v. International Life Ins. Co., 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) ], between the defendant and the forum State *648 necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State. Burger King, supra, 471 U.S., at 476, 105 S.Ct. 2174.... The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or -purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant’s awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.”
“ ‘480 U.S. at 110-12, 107 S.Ct. 1026.’
“Ex parte Mclnnis, 820 So.2d at 803-04 (most original emphasis omitted; new emphasis added).”
Alloy Wheels, 882 So.2d at 823-24.
In Ex parte Duck Boo, we noted that the Supreme Court embraced the stream-of-commerce test in World-Wide Volkswagen, stating: “ ‘The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.’ ” 985 So.2d at 911 (quoting World,-Wide Volkswagen, 444 U.S. at 297-98, 100 S.Ct. 559). We then stated:
“Because Alloy Wheels embraced a plurality opinion in Asahi and adopted a ‘stream-of-commerce-plus’ theory, it is at least arguable that we departed from binding precedent in World-Wide Volkswagen, where the stream-of-commerce test commanded a majority. Moreover, in the last analysis, the issue turns on what is fair and reasonable in order to satisfy due process.”
985 So.2d at 911. In addition, upon further reflection, we now conclude that what this Court requires of litigants under Alloy Wheels goes beyond the due process required by the United States Constitution and the Alabama Constitution and the last expression of the United States Supreme Court on the subject supported by a majority, albeit in dicta. As Justice Mur-dock, in his special writing in Ex parte Duck Boo, noted:
“According to Professor Myrha’s survey, cited in the majority opinion, 985 So.2d at 910 (citing Alison G. Myrha, Fifth Circuit Survey, June 2005-May 2006, Civil Procedure, 39 Tex. Tech L.Rev. 689, 718 n. 120 (2007)), a larger number of jurisdictions have expressed a preference for Justice O’Connor’s stream-of-commerce-plus approach. Even those jurisdictions, however, or at least many of them, have not deemed the ‘plus’ to require as much as this Court’s opinion in Alloy Wheels appears to require when it states that ‘[ejvidence of an intent or purpose to serve “the American market,” ’ may not be sufficient to establish that a defendant has purposefully availed itself of the privilege of selling its product in any one state for purposes of minimum-contacts analysis. See Ex parte Alloy Wheels Int'l, Ltd., 882 So.2d 819, 827 (Ala.2003).”
*649 985 So.2d at 912-13 (Murdock, J., concurring in the result) (footnote omitted).
As noted in note 4, supra, Professor Moore has collected cases from federal jurisdictions that endorse Justice O’Con-nor’s stream-of-commerce-plus view and cases that embrace Justice Brennan’s stream-of-commerce theory. The treatise notes support for Justice O’Connor’s view by the United States Courts of Appeals for the First, Fourth, Sixth, Eighth, and Eleventh Circuits. On the other hand, the treatise describes the Courts of Appeals for the Second, Fifth, Sixth, Seventh, Eighth, Ninth, and the Federal Circuits as aligned with the stream-of-commerce theory supported by Justice Brennan. The treatise also notes United States District Courts on both sides of the issue and state courts in North Carolina and West Virginia applying Justice Brennan’s stream-of-commerce test. See Moore’s Federal Practice — Civil § 108.42 n. 35 & 36 (3d ed.2008).
D. Applying United States Supreme Court Precedent to This Proceeding
1. Overview
DBI repeatedly invokes the mantra of “fifty years of precedent,” asserting the necessity for this Court to adhere to its previous decisions addressing the issue of personal jurisdiction over nonresident defendants. Our precedent, however, is only the result of an attempt to apply the precedent of the United States Supreme Court to the facts before us. In so doing, we search for a definition of the amorphous term “due process” the Framers applied as a limit on federal power in the Fifth Amendment and the citizens extended to the States upon ratification of the Fourteenth Amendment. We have no recent guidance from the United States Supreme Court. As previously noted, in the murky aftermath of the plurality opinions in As-ahi, the task has not been made any easier. Until more definite direction is given, we revert to the last expressions from the United States Supreme Court in WorldWide Volkswagen and Burger King that are not hampered by the lack of a majority.
The parties concede that the only precedent from this Court presenting similar facts is Alloy Wheels, decided in 2003. If that decision, when measured against World-Wide Volkswagen and Burger King, cannot be reconciled within the context of the global marketplace out of which the fact pattern in this case arises, we must consider overruling it, and, because we are dealing with a constitutional question, stare decisis, to the extent it otherwise might favor adherence to this precedent of only five years, has a diminished impact. As we stated in Ex parte Duck Boo:
“[T]he doctrine of stare decisis has diminished impact in a setting where we are dealing with a constitutional issue. See Ex parte State Farm Fire & Cas. Co., 764 So.2d 543, 547 n. 8 (Ala.2000) (‘The doctrine of stare decisis has a diminished efficacy in instances where the former decision is grounded in an erroneous application of the Constitution and corrective action is limited to constitutional amendment or overruling the earlier decision.’).”
985 So.2d at 911. For all the foregoing reasons, we are not inhibited by DBI’s exhortation that we adhere to “fifty years of precedent,” and we find ample reason to revisit Alloy Wheels.
In World-Wide Volkswagen, the plaintiffs, New York residents, purchased an Audi automobile from a New York dealership. The Audi was manufactured in Germany and imported into the United States by Volkswagen of America, Inc. World *650 Wide Volkswagen Corporation, the regional distributor of the Audi, served the states of New York, New Jersey, and Connecticut. In the course of traveling from New York to Arizona, the plaintiffs were involved in an automobile accident in Oklahoma. They later brought a products-liability action in Oklahoma, naming as defendants the manufacturer, importer, regional distributor, and dealership of the Audi. Both World-Wide Volkswagen and the New York dealership sought a writ prohibiting the trial judge from exercising in personam jurisdiction over them. When the Supreme Court of Oklahoma denied relief, they sought certiorari review in the United States Supreme Court. The Supreme Court reversed the judgment of the Supreme Court of Oklahoma, holding that the New York distributor and dealership did not have sufficient minimum contacts with Oklahoma to subject them to suit there. The Court stated:
“As has long been settled, and as we reaffirm today, a state court may exercise personal jurisdiction over a nonresident defendant only so long as there exist ‘minimum contacts’ between the defendant and the forum State. The concept of minimum contacts, in turn, can be seen to perform two related, but distinguishable, functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.
“The protection against inconvenient litigation is typically described in terms of ‘reasonableness’ or ‘fairness.’ We have said that the defendant’s contacts with the forum State must be such that maintenance of the suit ‘does not offend “traditional notions of fair play and substantial justice.” ’ The relationship between the defendant and the forum must be such that it is ‘reasonable ... to require the corporation to defend the particular suit which is brought there.’ Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State’s interest in adjudicating the dispute; the plaintiffs interest in obtaining convenient and effective relief, at least when that interest is not adequately protected by the plaintiffs power to choose the forum; the interstate judicial system’s interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.
“The limits imposed on state jurisdiction by the Due Process Clause, in its role as a guarantor against inconvenient litigation, have been substantially relaxed over the years. As we noted in McGee v. International Life Ins. Co., supra, 355 U.S. [220], at 222-223, 78 S.Ct. [199], at 201 [ (1957) ], this trend is largely attributable to a fundamental transformation in the American economy:
“ ‘Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.’
*651 “The historical developments noted in McGee, of course, have only accelerated in the generation since that case was decided.”
444 U.S. at 291-93, 100 S.Ct. 559 (citations omitted).
It is clear from World-Wide Volkswagen that foreseeability alone is not the determining factor.
“Applying these principles to the case at hand, we find in the record before us a total absence of those affiliating circumstances that are a necessary predicate to any exercise of state-court jurisdiction. Petitioners carry on no activity whatsoever in Oklahoma. They close no sales and perform no services there. They avail themselves of none of the privileges and benefits of Oklahoma law. They solicit no business there either through salespersons or through advertising reasonably calculated to reach the State. Nor does the record show that they regularly sell cars at wholesale or retail to Oklahoma customers or residents or that they indirectly, through others, serve or seek to serve the Oklahoma market. In short, respondents seek to base jurisdiction on one, isolated occurrence and whatever inferences can be drawn therefrom: the fortuitous circumstance that a single Audi automobile, sold in New York to New York residents, happened to suffer an accident while passing through Oklahoma.
“It is argued, however, that because an automobile is mobile by its very design and purpose it was ‘foreseeable’ that the Robinsons’ Audi would cause injury in Oklahoma. Yet ‘foreseeability’ alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause....
“This is not to say, of course, that foreseeability is wholly irrelevant. But the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant’s conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there. The Due Process Clause, by ensuring the ‘orderly administration of the laws,’ gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.
“When a corporation ‘purposefully avails itself of the privilege of conducting activities within the forum State,’ it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State. Hence if the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.”
444 U.S. at 295-98, 100 S.Ct. 559 (footnote omitted) (citations omitted).
*652 The United States Supreme Court expanded on the subject of personal jurisdiction in Burger King. There, two Michigan residents obtained a restaurant franchise from Burger King Corporation, a Florida corporation with its principal place of business in Miami. The franchisees contracted with Burger King to operate a restaurant in Michigan. The contracts executed by the parties provided that the franchise relationship would be governed by Florida law and provided for payment of all monthly fees and the giving of relevant notices to the Miami headquarters. After approximately two years, the patronage at the restaurant declined and the franchisees were not able to meet their financial obligations to Burger King. After negotiations failed, Burger King terminated the franchise and ordered the franchisees to vacate the premises. When they refused, Burger King sued them in federal district court in Florida. The franchisees argued that the United States District Court lacked personal jurisdiction over them. The court concluded that it had jurisdiction over the parties and, after a bench trial, entered a judgment in favor of Burger King. The United States Court of Appeals for the Eleventh Circuit reversed the district court’s judgment, concluding that exercising jurisdiction over the franchisees would offend the fundamental fairness inherent in due process. The United States Supreme Court reversed the judgment of the Eleventh Circuit. The Court stated:
“We have noted several reasons why a forum legitimately may exercise personal jurisdiction over a nonresident who ‘purposefully directs’ his activities toward forum residents. A State generally has a ‘manifest interest’ in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors. Moreover, where individuals ‘purposefully derive benefit’ from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed. And because ‘modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity,’ it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity.
“Notwithstanding these considerations, the constitutional touchstone remains whether the defendant purposefully established ‘minimum contacts’ in the forum State. Although it has been argued that foreseeability of causing injury in another State should be sufficient to establish such contacts there when policy considerations so require, the Court has consistently held that this kind of foreseeability is not a ‘sufficient benchmark’ for exercising personal jurisdiction. Instead, ‘the foreseeability that is critical to due process analysis ... is that the defendant’s conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.’ In defining when it is that a potential defendant should ‘reasonably anticipate’ out-of-state litigation, the Court frequently has drawn from the reasoning of Hanson v. Denckla, 357 U.S. 235, 253 (1958):
“ ‘The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant’s activity, but it is *653 essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.’
“This ‘purposeful availment’ requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of ‘random,’ ‘fortuitous,’ or ‘attenuated’ contacts, or of the ‘unilateral activity of another party or a third person.’ Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that create a ‘substantial connection’ with the forum State. Thus where the defendant ‘deliberately’ has engaged in significant activities within a State, or has created ‘continuing obligations’ between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by ‘the benefits and protections’ of the forum’s laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.
“Jurisdiction in these circumstances may not be avoided merely because the defendant did not physically enter the forum State. Although territorial presence frequently will enhance a potential defendant’s affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modem commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor’s efforts are ‘purposefully directed’ toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.”
471 U.S. at 473-76, 105 S.Ct. 2174 (footnotes omitted) (citations omitted). Significantly, the Supreme Court in Burger King quoted from Worl<K-Wide Volkswagen as follows:
“Thus ‘[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State’ and those products subsequently injure forum consumers.”
471 U.S. at 473, 105 S.Ct. 2174 (quoting World-Wide Volkswagen, 444 U.S. at 297-98,100 S.Ct. 559).
Once the Supreme Court determined in Burger King that minimum contacts had been established, the Court discussed other factors that could be considered in establishing jurisdiction.
“Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with ‘fair play and substantial justice.’ Thus courts in ‘appropriate case[s]’ may evaluate ‘the burden on the defendant,’ ‘the forum State’s interest in adjudicating the dispute,’ ‘the plaintiffs interest in obtaining convenient and effective relief,’ ‘the interstate judicial system’s interest in obtaining the most efficient resolution of controversies,’ and the ‘shared interest of the several States in furthering fundamental substantive social policies.’ These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. On *654 the other hand, where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable. ... Nevertheless, minimum requirements inherent in the concept of ‘fair play and substantial justice’ may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities. ... [Jjuris-dictional rules may not be employed in such a way as to make litigation ‘so gravely difficult and inconvenient’ that a party unfairly is at a ‘severe disadvantage’ in comparison to his opponent.”
471 U.S. at 476-78, 105 S.Ct. 2174 (footnotes omitted) (citations omitted).
2. Purposeful Availment
DBI first argues that it has not purposefully directed any activities toward Alabama and that it cannot be subject to jurisdiction in Alabama simply because it placed a product into the stream of commerce. DBI maintains that it does not know how many of its seat belts are placed in automobiles that are destined for Alabama and that it is unable to determine how much revenue it derives from seat belts in vehicles delivered to Alabama. No matter which test for personal jurisdiction this Court adopts, DBI contends, Leytham must prove that DBI purposefully availed itself of the privilege of doing business in Alabama, and, DBI says, there is no evidence before this Court that establishes that DBI purposefully directed any activities toward Alabama. DBI maintains there is no evidence in this record showing that it knew its products were being marketed in Alabama. The evidence, DBI says, shows only that it knew that its products were incorporated into automobiles being sold by Kia Motors in the North American market. Therefore, DBI concludes, it had no reason to anticipate being sued in Alabama.
Leytham points out that DBI contracted with a New Jersey company to test its seat belts to obtain a label stating that the seat belts complied with the FMVSS, which rendered the seat belts marketable in the United States. Furthermore, Leytham says, DBI entered into a claims-indemnification contract with Kia Motors; it maintains insurance coverage against risks or losses occurring in the United States; and it retains defense counsel here. Leytham argues that because DBI designed its seat belts to comply with the FMVSS and because it knew that Kia Motors would incorporate its seat belts into automobiles that would be sold nationally in the United States, DBI should have known that some of those automobiles would be sold in Alabama. Should any of those seat belts prove defective, Leytham says, DBI should have anticipated that it could be sued in Alabama.
After considering all the facts and circumstances presented in this case, we conclude that DBI purposefully availed itself of the privilege of doing business in the Alabama market so that exercising jurisdiction over it would not offend the requirements of due process.
Although DBI has never had a physical presence in Alabama, being physically present in a state is not required in order for a state court to have personal jurisdiction over a defendant. Burger King, 471 U.S. at 476, 105 S.Ct. 2174. DBI knew that its seat belts were incorporated into automobiles sold by Kia Motors in the United States. It is not subject to reasonable dispute that it is generally known that a product such as a mass-produced automobile is marketed on a broad spectrum and is not a boutique product fit for only a narrow class of con *655 sumers. Likewise, an automobile manufacturer is involved in the sales of its products on a national as opposed to a regional basis. Perhaps the supplier of a part to a snow-plow manufacturer could reasonably say it did not anticipate that its product would be sold in Alabama, but, clearly, moderately priced, fuel-efficient automobiles, such as those manufactured by Kia Motors, are destined for sale in all 50 states in this country. Kia Motors has nine dealerships in Alabama. DBI, by choosing to enter into a contractual relationship with Kia Motors pursuant to which DBI would turn a profit by supplying an essential component part vital to the safety of passengers for such automobiles under the circumstances here described, cannot reasonably assert ignorance of these realities of the marketplace.
The facts presented here stand in stark contrast to the facts in World-Wide Volkswagen in which the Court found the absence of “purposeful availment” in the context of the confluence of a random and unilateral event in the forum state. See Burger King, 471 U.S. at 474, 105 S.Ct. 2174, quoting Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) (“ ‘The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.’ ”) and 471 U.S. at 475, 105 S.Ct. 2174 (“This ‘purposeful availment’ requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of ‘random,’ ‘fortuitous,’ or ‘attenuated’ contacts, or of the ‘unilateral activity of another party or a third person.’ ” (citations omitted)); World-Wide Volkswagen, 444 U.S. at 299,100 S.Ct. 559.
Under the stream-of-commerce test, as articulated in World-Wide Volkswagen and Burger King, we conclude that the trial court correctly held that an Alabama court can exercise personal jurisdiction over DBI. As previously noted, the United States Supreme Court stated in both World-Wide Volkswagen and Burger King that “‘[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State’ and those products subsequently injure forum consumers.” 471 U.S. at 473, 444 U.S. at 297-98.
The automobile containing the seat belt that Leytham alleges malfunctioned and contributed to Stabler’s death did not find its way to Alabama randomly and fortuitously. To the contrary, a dealer acting for a manufacturer with which DBI had significant ties sold the vehicle in Alabama to an Alabama resident who was driving on an Alabama highway when she died as a result of the accident that is the subject of this lawsuit. In this respect, the circumstances here are totally different from those in World-Wide Volkswagen, where an automobile purchased in New York from a New York dealer by New York residents happened to be involved in an accident in Oklahoma.
As the Supreme Court stated in World-Wide Volkswagen, the foreseeability crucial to a due-process analysis is not the “mere likelihood” that a product will find its way into the forum state but that a defendant’s conduct and its connection with the forum state “are such that he should reasonably anticipate being haled into court there.” 444 U.S. at 297, 100 S.Ct. 559. In selling seat belts compliant with the FMVSS to Kia Motors, DBI should have foreseen that a certain percentage of the automobiles manufactured by Kia Motors would be distributed to the Kia dealerships in Alabama and sold in *656 Alabama. Therefore, we hold that it would have been reasonable for DBI to anticipate being haled into court in Alabama. Indeed, DBI purchased insurance to protect itself in such event.
3. Traditional Notions of Fair Play and Substantial Justice
Turning to the requirement that the maintenance of Leytham’s suit in Alabama “ ‘does not offend “traditional notions of fair play and substantial justice,” ’ ” World-Wide Volkswagen, 444 U.S. at 292, 100 S.Ct. 559 (quoting International Shoe Co. v. Washington, 326 U.S. at 316, 66 S.Ct. 154, quoting in turn Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)); Burger King, 471 U.S. at 476, 105 S.Ct. 2174, DBI argues that the fundamental-fairness prong of the personal-jurisdiction test weighs against exercising personal jurisdiction over it. DBI argues that because it is a foreign corporation that does no business in the United States, let alone Alabama, and because all the witnesses and evidence concerning the seat belt that allegedly malfunctioned are in South Korea, the burden on DBI to defend itself in Alabama would be severe. DBI acknowledges that it has defended itself in other lawsuits in the United States when it was required to do so, but it contends that the process was substantially burdensome. Leytham contends that because she has sued Kia Motors and the Mobile Kia dealership in Alabama, requiring her to file a separate action against DBI in South Korea would spread thin her resources, hamper her ability to obtain quick, convenient, and effective relief, and unnecessarily waste judicial resources. She contends that because DBI engages in international commerce, the burden on it to defend itself in Alabama would not be as substantial as it suggests. Finally, Leytham contends that Alabama has a significant interest in seeing that its citizens are not injured here by defective products and that this factor weighs in favor of exercising jurisdiction in Alabama to protect Alabama citizens.
Both Worldr-Wide Volkswagen and Burger King discuss the factors necessary to determine whether, after the defendant’s minimum contacts with the forum state have been established, subjecting that defendant to litigation in that particular forum complies with traditional notions of fair play and substantial justice. These factors include “the burden on the defendant,” “the forum State’s interest in adjudicating the dispute,” “the plaintiffs interest in obtaining convenient and effective relief,” “the interstate judicial system’s interest in obtaining the most efficient resolution of controversies,” and the “shared interest of the several States in furthering fundamental substantive social policies.” World-Wide Volkswagen, 444 U.S. at 292, 100 S.Ct. 559; Burger King, 471 U.S. at 477, 105 S.Ct. 2174.
The Supreme Court noted in Burger King that a state “generally has a ‘manifest interest’ in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors.” 471 U.S. at 473, 105 S.Ct. 2174. Considering the fact that the subject seat belt is alleged to have contributed to the death of an Alabama resident on an Alabama highway, we find that Alabama has such a manifest interest in providing Leytham with a convenient forum in which to litigate her claims.
There remains the question of the degree of the burden on DBI by being required to litigate in Alabama. Of course, World-Wide Volkswagen and Burger King dealt with the burdens of litigating in one of the United States as opposed to another of the states of the Union. Here, we deal *657 with burdens between litigating in one of the United States and in a forum in South Korea. The Supreme Court noted in World-Wide Volkswagen that “[t]he limits imposed on state jurisdiction by the Due Process Clause, in its role as a guarantor against inconvenient litigation, have been substantially relaxed over the years.” 444 U.S. at 292,100 S.Ct. 559. The Court then stated, “As we noted in McGee v. International Life Ins. Co., supra, 355 U.S., at 222-223, 78 S.Ct. 199, this trend is largely attributable to a fundamental transformation in the American economy.” 444 U.S. at 292-93, 100 S.Ct. 580. The Court then quoted the portion of McGee, written in 1957, recognizing that “modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.” 444 U.S. at 293,100 S.Ct. 559.
Those who litigated in matters involving international parties in the early and mid 1980s, when the most recent cases on personal jurisdiction over nonresident defendants from the United States Supreme Court were decided, will recall that the airplane was the principal means of conveying people, documents, and objects between the offices of a corporate party in a foreign country and the United States. Telephone calls were plagued by annoying echoes and delays in this era predating submarine fiber-optic cables. Facsimile machines had recently become available, but were a clumsy means of transferring documents of any significant size.
Today, the airplane remains the only practical method of conveying people and bulky objects, but the necessity for travel by lawyers and witnesses is significantly diminished by the availability of video conferencing. Voluminous documents and visual images can be transmitted instantaneously by attachment to e-mails sent over the Internet. The facsimile machine, which had not even been invented when McGee was decided in 1957, now has a very limited role. Compact cellular telephones with self-contained batteries relying on satellite signals offer reliable, cost-effective, and high-quality communication between the United States and abroad, technology unavailable when the United States Supreme Court last addressed the issue of personal jurisdiction over a foreign corporation. We echo what was said in McGee in 1957 and relied upon in Worldr-Wide Volkswagen in 1982: “[Mjodern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.” Requiring DBI, a South Korean corporation, to defend itself in Alabama does place a burden on DBI, but we do not deem the burden to be of such a magnitude that it rises to the level of being inconsistent with traditional notions of fair play and substantial justice.
V. Conclusion
Applying the principles in World-Wide Volkswagen and Burger King to the facts and circumstances of this case, we conclude that the trial court correctly determined that it has personal jurisdiction over DBI. DBI cannot, therefore, show that it has a clear legal right to the relief it seeks; accordingly, we deny DBI’s petition for a writ of mandamus. To the extent that Alloy Wheels is inconsistent with this opinion, it is expressly overruled.
PETITION DENIED.
COBB, C.J., and WOODALL, PARKER, and MURDOCK, JJ., concur.
STUART, SMITH, BOLIN,* and SHAW, JJ., concur in the result.

. The volume, the value, and the alleged hazardous character of the product are factors in the test for personal jurisdiction formulated by Justice Stevens in his opinion in Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102, 122, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (Stevens, J., concurring in part and concurring in the judgment).

. As previously noted, DBI stated in discovery that it was “no longer in possession of information responsive to the interrogatories for the years 1997 to 2002."

3. When Rule 4.2, Ala. R. Civ. P., was amended effective August 1, 2004, the rule was completely rewritten. Subparagraph (I), a "catchall” clause, is now contained in Rule 4.2(b).

. For a recent discussion of the split in federal courts post-Asahi, see 16 James W. Moore et al., Moore's Federal Practice — Civil § 108.42 n. 35 & 36 (3d ed.2008). State courts are similarly split over this issue.